## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

TAMARA O'REILLY,          )
                                 )
        Plaintiff(s),         )
                                 )
        vs.              )     Case No. 4:18-cv-01283 SRC
                                 )
DAUGHERTY SYSTEMS, INC.,    )
                                 )
        Defendant(s).     )

### Memorandum and Order

Tamara O'Reilly claims her former employer, Daugherty Systems,[1] paid her less than her comparable male coworkers, and brought a collective action under the Fair Labor Standards Act and the Equal Pay Act.  The Court conditionally certified a collective class composed of current and former female Daugherty employees.  Following the close of discovery, Daugherty argues that O'Reilly and the other female Daugherty employees who opted into the class lack the similarity necessary to proceed in a collective action, and moves to decertify the collective class.

## I.      Background

O'Reilly filed this putative collective action claiming Daugherty discriminated against female consultants and support staff by providing them with lower pay than similarly-situated male consultants and support staff, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*., and the Equal Pay Act, 29 U.S.C. § 206, *et seq*.  Before conditional class certification, the class consisted of O'Reilly and opt-in plaintiffs Rebecca Fuqua and Justine Dugan.  Docs. 29–30.  Following conditional class certification, Doc. 50, 41 female employees opted into the class, bringing the total class to 44 former and current Daugherty female employees.  Doc. 68.  The

---

[1] The Court refers to Daugherty Systems as "Daugherty," and refers to Ron and Janet Daugherty by their full names.

Court dismissed 14 of the opt-in plaintiffs because their claims fell outside the applicable statute of limitations. Doc. 80. The Court dismissed four other opt-in plaintiffs for failure to comply with the Court's discovery order. Doc. 94. Six other opt-in plaintiffs withdrew from this action. Doc. 139. Accordingly, the class consists of 20 members, with O'Reilly serving as the class representative.[2]

Daugherty now moves to decertify the class. Doc. 97. With Plaintiffs having filed an opposition, Doc. 104, and Daugherty filing its reply, Doc. 117, the motion is now ripe for review.

## II.    Standard

Under the FLSA, plaintiffs may sue for failure to pay overtime and other violations of the statute on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216(b); *see also Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014), *aff'd and remanded*, 577 U.S. 442 (2016) (citing 29 U.S.C. § 216(b)). When applying the FLSA to a potential group of plaintiffs, district courts in this circuit apply a two-step analysis. *Getchman v. Pyramid Consulting, Inc.*, No. 4:16-CV-1208 CDP, 2017 WL 713034, at *4 (E.D. Mo. Feb. 23, 2017) (collecting cases).

In the first step, the plaintiff moves for conditional certification "for notice purposes at an early stage of the litigation." *Id*. The plaintiffs' burden for the first step "is not onerous." *Id*. (citing *Kautsch v. Premier Comm'ns*, 504 F. Supp. 2d 685, 688 (W.D. Mo. 2007)). Plaintiffs need only provide "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." *Id*. at 689 (quoting *Davis v. NovaStar Mortgage,*

---

[2] The remaining plaintiffs include Named Plaintiff Tamara O'Reilly and Opt-in Plaintiffs Rebecca Fuqua, Christina Dunn, Deena Sneed, Jennifer Thompson, Lauren Griffith, Martha Coyle, Pam Doty, RaNae Franke, Sheila Rogers-Lucas, Wendy Smith, Eileen McMullen, Kristyn Angelo, Catherine Nistler, Caitlyn Marshall, Rachana Gil, Julia Froese, Helene Schultz, Jennifer Buckley, and Linda Owens.

*Inc.*, 408 F. Supp. 2d 811 (W.D. Mo. 2005)).  In the second step, the court determines, after the close of discovery, whether the plaintiffs are actually similarly situated.  *Id.*  In contrast to the first stage, plaintiffs carry a "stricter" burden at the decertification stage.  *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 372 (E.D. Mo. 2014) (quoting *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005)).

Plaintiffs can establish that they are similarly situated either by proving that the employer "engaged in a unified policy, plan, or scheme of FLSA violations," or that "their positions are 'similar, not identical' to the positions held by the other class members."  *White,* 301 F.R.D. at 372 (quoting *Kautsch*, 2008 WL 294271, at *1); *see also Bouaphakeo*, 765 F.3d at 796 (explaining that plaintiffs may be similarly situated if "they suffer from a single, FLSA-violating policy and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." (quoting source omitted)).  When determining whether the plaintiffs are similarly situated, the Court may consider "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."  *Bouaphakeo*, 765 F.3d at 796 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir. 2001)); *see also White*, 301 F.R.D. at 372 (quoting *Thiessen*, 267 F.3d at 1103).  "At the second stage, 'the question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected.'"  *White*, 301 F.R.D. at 372 (citation omitted); *see also Arnold v. Directv, LLC*, No. 4:10-CV-352-JAR, 2017 WL 1251033, at *2 (E.D. Mo. Mar. 31, 2017).

If the Court finds that the class members are similarly situated, the action proceeds to trial.  *White*, 301 F.R.D. at 372 (citation omitted); *Arnold*, 2017 WL 1251033, at *2.  If not, then

the Court decertifies the class, dismisses the opt-in plaintiffs, and allows the class representative to proceed with her individual claim. *White*, 301 F.R.D. at 372 (citation omitted); *Arnold*, 2017 WL 1251033 at *2. "The decision to certify or decertify a collective action under section 216(b) is within the district court's discretion." *White*, 301 F.R.D at 372 (quoting *Nerland v. Caribou Coffee Co., Inc.,* 564 F. Supp. 2d 1010, 1018 (D. Minn. 2007)).

## III.   Discussion

### A.    Disparate and factual employment settings of individual plaintiffs

Plaintiffs argue that they presented sufficient evidence establishing that Daugherty adopted a company-wide policy of discriminatory pay. Doc. 104 at pp. 13–15. They claim that they have carried their burden by providing evidence demonstrating that Daugherty's owners and executive team made centralized pay decisions that resulted in each plaintiff being paid less than at least one comparable male employee. *Id*. at p. 14. In describing Daugherty's description of the differences between the plaintiffs' job responsibilities, titles, roles, etc. as a "smoke-screen[,]" *id*., Plaintiffs clarify that the sole similarity they base the collective action on is that they are all female employees of a company that had a company-wide policy of paying women less than men. Accordingly, in line with the practice of other federal courts, *see*, *e.g.*, *Arnold*, 2017 WL 1251033, at *3–8, the Court assesses below whether a single policy applies under the "disparate and factual employment settings" factor.

#### 1.    Daugherty's organizational structure and employee classification

##### i.    Organizational structure

Daugherty is a software consulting company in the information technology industry that provides management consultant services as well as the consultation and custom development of software solutions to meet client business needs. Doc. 98-2 at ¶¶ 3, 4. Ron Daugherty and Janet

4

Daugherty created Daugherty as an S Corporation in 1987.  Garofalo Dep. 8:3–9:8, Doc. 104-1.

Ron Daugherty serves as Daugherty's President and CEO, while Janet Daugherty serves as Vice-

President and Corporate Secretary.  *Id*. at 29:18–20.

Daugherty's headquarters is in St. Louis, and has business units located throughout the

United States, including Atlanta, Minneapolis, Dallas, Chicago, and smaller units in Columbus

and the New York/New Jersey area.  Doc. 98-2 at ¶¶ 5–6; Doc. 98-3 at ¶ 4; Doc. 98-4 at ¶ 3.

Each business unit is managed by its own leadership team, led by a business unit leader or

Managing Director.  Doc. 98-4 at ¶¶ 4–7.  The responsibilities of Managing Directors include

consultant career development, managing all the business unit's employees, and the profits and

losses of the business unit.  Doc. 98-4 at ¶ 9.

### ii.     Employee classification

"[F]or management and accounting purposes[,]" Daugherty separates its employees into

various departments, and each department has a corresponding department code.  Doc. 98-2 at ¶

8; Doc. 98-3 at ¶ 5.  With the conditional class consisting of current and former female

consultants and sales employees, the department codes at issue include: Department Code 003

(Sales), Department Code 007 (Delivery Management), and Department Code 110 (Consulting).

Doc. 50; Doc. 98 at p. 8; Doc. 104 at p. 7.

Department Code 003 consists of Daugherty's sales employees primarily responsible for

generating new business and growing existing business.  Doc. 98-3 at ¶ 7.  Department Code 007

consists of Daugherty's supervisory and management employees primarily responsible for

leading Daugherty's consultants (those employed in Department Code 110).  Doc. 98-3 at ¶ 12.

Those in Department Code 007 also act as Daugherty's main client-relationship builders.  *Id*.

Department Code 110 consists of employees in client-delivery roles.  Doc. 98-3 at ¶ 9.  These employees provide direct services to Daugherty's clients.  *Id*. at ¶ 10.

Daugherty further separates the consultants in Department Code 110 into four separate lines of service, depending on the nature of the services or solutions provided to the client and the individual consultant's area of competency.  *Id*. at ¶ 11; O'Reilly Dep. at 33:2–13, Doc. 98-5. The lines of service include: 1) software architecture and engineering; 2) business alignment/analysis; 3) data and analytics; and 4) project management/delivery leadership.  Doc. 98-3 at ¶ 11; O'Reilly Dep. at 36:6–37:15, Doc. 98-5; O'Reilly Vol. II Dep. at 43:10–44:6, Doc. 98-55.  Each line of service has a variety of roles.  Doc. 98-3 at ¶ 11; Doc. 98-4 at ¶¶ 12, 14. Additionally, each line of service is managed by a "Line of Service Leader," whose title ranges from Senior Manager to Senior Director.  Doc. 98-4 at ¶ 15.  Underneath the LOS Leader is a Senior Consultant or Principal Consultant, who has the responsibility of managing teams of consultants assigned to Daugherty's clients.  *Id*. at ¶¶ 17–18.

In addition to being placed in a specific role within one of the lines of service, Daugherty employees receive a title.  *Id*. at ¶ 19.  The different titles indicate a hierarchy, with each title change resulting in greater responsibility.  O'Reilly Dep. at 40:16–41:5, Doc. 98-5.  For example, a "senior consultant" has more responsibility than a "consultant."  *Id*. at 41:6–11.

Due to the variety of roles, titles, and lines of service, neatly classifying Daugherty employees proves a difficult task.  Evidence of this difficulty comes from O'Reilly herself, who explained that "not all consultants have the same job duties and responsibilities" and can even have the same job with different responsibilities.  Doc. 98-44 at p. 17; O'Reilly Vol. II Dep. at 55:9–12, Doc. 98-55.

### iii.    Plaintiffs' placement within Daugherty's structure

Plaintiffs had a variety of titles at Daugherty during the relevant time, including Director (1), Principal (4), Senior Manager (1), Manager (2), Senior Consultant (13), Consultant (9), and Associate Consultant (1).  Doc. 98-6; Doc. 98-7; Doc. 98-8; Doc. 98-9; Doc. 98-10; Doc. 98-11; Doc. 98-12; Doc. 98-13; Doc. 98-14; Doc. 98-15; Doc. 98-16; Doc. 98-17; Doc. 98-18; Doc. 98-19; Doc. 98-20; Doc. 98-21; Doc. 98-22; Doc. 98-23; Doc. 98-25 at p. 1; Doc. 98-44 at pp. 11, 15, 22–27.  Many plaintiffs had multiple titles during the relevant time period.  *Id.*

Plaintiffs also held different roles at Daugherty, including Client Partner (1), Program Manager (2), Project Manager II (9), Project Manager I (5), Business Analyst III (3), Business Analyst II (3), and Software Engineer I (1).  *Id.*  Additionally, Daugherty placed Plaintiffs in a variety of lines of service, including program management (14), business alignment/analytics (4), and software architecture and engineering (1).  *Id.*  Daugherty did not assign Fuqua to a line of service because she was not a consultant in Department Code 110.  Doc. 98-4 at ¶ 21.

In addition to the different titles, lines of service, and roles, Plaintiffs were spread across five different business units: St. Louis (8), Minneapolis (8), Chicago (2), Dallas (1), and Atlanta (1).  Doc. 98-4 at ¶ 22; O'Reilly Dep. 47:25–48:8, Doc. 98-5 at p. 13; Doc. 98-6; Doc. 98-7; Doc. 98-8; Doc. 98-9; Doc. 98-10; Doc. 98-11; Doc. 98-12; Doc. 98-13; Doc. 98-14; Doc. 98-15; Doc. 98-16; Doc. 98-17; Doc. 98-18; Doc. 98-19; Doc. 98-20; Doc. 98-21; Doc. 98-22; Doc. 98-23; Doc. 98-25 at p. 5.

Even within each business unit, Daugherty assigned employees to different clients, meaning that Daugherty spread out its employees among different clients.  Thus, because Daugherty scattered Plaintiffs among a variety of clients, the supervisors that each plaintiff identified depended on which client they were assigned to.  For example, Daugherty assigned

7

Rachana Gil, a project manager in the St. Louis business unit, to Charter Communications and she identified David Hanes, Darryl Patterson, Andrew Stevens, Alexis Traylor, Wayne Turley, Peggy Disch, and Thomas Emmons as her supervisors/managers.  Doc. 98-32 at p. 5. Meanwhile, Daugherty assigned Julia Froese, another project manager in the St. Louis business unit, to Express Scripts and she identified Ben Hanks, Victoria Holmes, and Pam Nutt as her supervisors/managers.  Doc. 98-31 at p. 4.  As a result of this practice, rather than identifying a small group of overlapping supervisors, Plaintiffs identified a total of 43 different supervisors, including 24 alone among the eight plaintiffs located in St. Louis.  Doc. 98-25 at p. 5; Doc. 98-26 at p. 7; Doc. 98-27 at p. 3; Doc. 98-28 at p. 3; Doc. 98-30 at p. 5; Doc. 98-31 at p. 4; Doc. 98-32 at p. 5; Doc. 98-33 at p. 4; Doc. 98-34 at p. 7; Doc. 98-35 at p. 3; Doc. 98-36 at p. 3; Doc. 98-37 at p. 3; Doc. 98-38 at p. 3; Doc. 98-39 at p. 4; Doc. 98-40 at 5; Doc. 98-41 at p. 3; Doc. 98-42 at p. 4; O'Reilly Dep. at p. 20:8-13, Doc. 98-5.

### 2. Daugherty's budget and compensation process

Plaintiffs do not dispute the aspects of the organizational structure explained above. Instead, to establish that Daugherty had a company-wide policy of compensating female employees less than male employees, Plaintiffs focus on how Daugherty approved its budget.

The managing directors and branch managers, in consultation with corporate leadership, prepared Daugherty's budget each year.  Garofalo Dep. at 19:2–9, Doc. 104-1.  Ron Daugherty and John Wirth provided a "sanity" check for the budget proposed by each branch unit.  *Id.* at 120:11–121:10.  This "sanity" check involved assessing whether the budget for a branch made sense after considering how account growth in that branch's market may be affected by that branch's activity, issues at the national level, client activity, and how that branch compares to

other Daugherty branches. *Id.* at 124:14–126:17.  Ultimately, final approval of the budget rested with Janet and Ron Daugherty. *Id.* at 19:10–13.

Plaintiffs claim that corporate leadership, meaning Ron Daugherty and Wirth, approved employee salaries with input from managing directors when each unit's budget was presented to them.  Doc. 104 at p. 7.  To support this assertion, Plaintiffs cite testimony given by Rick Mayhall, the managing director of Daugherty's Atlanta's office.  *See* Mayhall Dep. at 16:4–14, Doc. 104-3.  But Mayhall's testimony does not support Plaintiffs' position.  Instead, Mayhall testified that while "the overall salary adjustment for the entire branch was reviewed at a higher level, . . . individuals were not." *Id.*  In other words, Mayhall did not need approval to adjust an individual employee's salary.  Only an adjustment applicable to the entire branch would be subject to corporate approval. *Id.*

Daugherty provided other evidence demonstrating that compensation decisions occurred at the local level.  For example, Janet Daugherty stated in her declaration that "[f]inal compensation decisions for employees within Department Code 110 are made by the business unit's managing director."  Doc. 98-3 at ¶ 21.  Similarly, the managing directors of certain Daugherty business units, Nicholas Reinhold (Minneapolis), Wirth (St. Louis), and Coleen Finnegan (Chicago and Dallas), stated that they held final authority for all compensation decisions for employees in Department Code 110 in their respective branches, including approval of any raises and promotions.  Doc. 98-51 at ¶ 4; Doc. 98-53 at ¶¶ 7–8; Doc. 98-52 at ¶ 4.  Finnegan also testified that she made the final decision on a new hire's salary.  Finnegan Dep. at 30:20–25, Doc. 117-5.

And Robin Mirly, a line-of-service lead in the business-alignment unit in the St. Louis branch, testified that line-of-service leads in the St. Louis branch provided salary

9

recommendations to Wirth.  Mirly Dep. at 9:15–25; 116:9–19, Doc. 104-4.  She further

explained that Wirth had final authority for compensation decisions involving St. Louis

employees and did not need final approval from Ron or Janet Daugherty.  *Id.*

Regarding compensation for new hires, Wirth stated that as Senior Vice President, he has

direct involvement in compensation decisions for Department-Code-003 new hires, along with

Ron Daugherty.  Doc. 98-53 at ¶ 5.  Additionally, he also has direct involvement in

compensation decisions for Department Code 007 new hires, and receives occasional input from

Ron Daugherty.  *Id.* at ¶ 6.  However, the company bases its compensation decisions for

Department Code 110 new hires on salary bands developed by comparing market data from the

website salary.com.  Doc. 98-3 at ¶ 22.  Janet Daugherty and Ron Daugherty play no role in

compensation decisions for employees in Department Code 110.  *Id.* at ¶ 22.  While the evidence

demonstrates that the initial salary for employees in Department Codes 003 and 007 are made by

Ron Daugherty and Wirth, the remainder of the evidence indicates that beyond this initial salary,

all compensation decisions are made at the local level by the branch's managing director.

Plaintiffs also rely heavily on testimony from Mike Garofalo, Daugherty's Chief

Financial Officer since the mid-1990s.  Garofalo Dep. at pp. 8:1–9:22, Doc. 104-1.  Garofalo

testified that Daugherty's final budget does not get approved at one final meeting, but rather after

a series of ongoing meetings between Ron Daugherty, Janet Daugherty, himself, and business

unit managers.  *Id.* at 19:18–20:7.  Garofalo also explained that the accounting department,

which he oversees, uses the final budget to mark up against actual revenue and to forecast future

revenue.  *Id.* at 21:7–14.  Additionally, the accounting department provides weekly updates on

projected revenue.  *Id.* at 20:3–10.

Garofalo, as the supervisor for all employees in the accounting department and technology services department, set the salaries and incentive compensation for employees in those two departments.  *Id.* at 95:11–24.  However, his compensation decisions were subject to the approval of Janet and Ron Daugherty.  *Id.* at 95:25–96:14.  Nevertheless, because no employees in the accounting department (Department Code 006) and technology services department (Department Code 010) are part of the class, the fact that Ron and Janet Daugherty approved the compensation of these employees has no relevance to the compensation scheme affecting the members in the class.

Additionally, Garofalo clarified the relationship between Daugherty's budget and its compensation scheme.  He testified that each individual location of Daugherty sets its own budget, *id.* at 74:7–75:23, and then Ron Daugherty, Wirth, Garofalo, and sometimes Janet Daugherty, review each local budget.  *Id.* at 33:4–9.  Garofalo then explained that Daugherty's corporate budget consists of a compilation of these local budgets.  *Id*. at 85:8–86:7.  And, with respect to the Daughertys approving the budget, Garofalo described this process as a formality.  *Id.* at 33:25–34:8.

Next, he testified that compensation, title changes, promotions, and salary actions occur at the branch level, and are not "really part of [the] budget."  *Id.* at 133:2–18.  He explained that the budget allots for cost-of-living increases, a certain number of hires, and a certain average salary.  *Id.* at 133:19–24.  The local branch unit then works within those parameters in awarding compensation.  *Id.* at 133:25–134:3.  His other testimony reflects that compensation decisions were made at the local level.  *Id.* at 134:3–4.  He stated that "pay decisions are a local decision at that local branch unit level[,]" *id*. at 86:23–87:1, and that "[t]here's not somebody at the enterprise level . . . overseeing the salary, annual assessment, reviews, compensation reviews . . .

at the branch level." *Id*. at 108:20–24.  He also testified that promotions, salary changes, or anything similar did not come from the "top," but rather started at the branch level.  *Id*. at 131:1–16.  The recommendation at the branch level would then go up to the corporate level, and get approved "99.9%" of the time.  *Id*. at 131:17–20.  Finally, he stated that the Daughertys did not set what incentive compensation would be available for each business unit; rather the local managing director establishes the amount in their local budget.  *Id*. at 88:3–13.

O'Reilly's testimony also reflected that compensation decisions occurred at the local level.  She explained that discretionary bonuses for consultants that reported to her depended on the scenario.  O'Reilly Dep. at 52:10–24, Doc. 98-5.  "It could be a combination of a recommendation that was jointly sponsored by [her] alongside a line of service leader.  There . . . was a circumstance where it was a suggestion from John Worth [sic] to give an individual a discretionary bonus."  *Id*. at 52:19–24.  She also stated that she made compensation recommendations for the team members she managed.  Doc. 98-44 at p. 21; O'Reilly Vol. II Dep. at 61:1–6, Doc. 98-55.  O'Reilly further agreed that determining incentive compensation "was a collaborative effort."  O'Reilly Vol. II Dep. at 86:4–6, Doc. 98-55.  Another plaintiff also stated that "it was her understanding the branch had decision rights for their employees' compensation. . . ."  Doc. 98-26 at pp. 14–15.

### i.    Plaintiffs' placement within compensation scheme

As stated above, Plaintiffs work or worked in either Department Code 003, 007, or 110, and each department has a distinct compensation structure.  Compensation for employees in Department 003 is composed of a base salary, commission, and a discretionary bonus in some cases.  Doc. 98-3 at ¶ 16.  Compensation for employees in Department 007 is composed of a base salary and incentive compensation based on the employee's individual performance as well

as the performance of their business unit. *Id*. at ¶ 24. Employees in Department 110 receive a base salary, with a possibility of a small discretionary bonus if they reach a leadership position within their line of service. *Id*. at ¶ 19; O'Reilly Dep. at 49:16–51:4, Doc. 98-5; O'Reilly Vol. II Dep. Doc. 98-55 at 84:8–85:17.

Based on this compensation structure, fifteen Plaintiffs admit they could not or did not receive incentive compensation. Doc. 98-29 at pp. 8–9; Doc. 98-41 at pp. 8–9; Doc. 98-42 at pp. 9–10; Doc. 98-27 at pp. 8–9; Doc. 98-28 at pp. 7–8; Doc. 98-30 at p. 11; Doc. 98-38 at p. 9; Doc. 98-24 at p. 10; Doc. 98-40 at p. 11; Doc. 98-35 at pp. 5, 8–9; Doc. 98-36 at pp. 8–9; Doc. 98-37 at p. 11; Doc. 98-31 at pp. 6, 9–10; Doc. 98-39 at p. 10; Doc. 98-43 at p. 14. In contrast, O'Reilly received a compensation bonus and received overtime payments. O'Reilly Dep. at 21:18–22:7, Doc. 98-5; Doc. 98-57 at p. 2. Smith likewise received a bonus for overtime worked. Doc. 98-40 at pp. 7–8. And Owens's and Angelo's compensation included a base salary as well as a bonus based on factors such as sales, performance, and profitability. Doc. 98-37 at p. 3; Doc. 98-25 at pp. 9–10.

Additionally, when asked to identify the individuals responsible for making decisions regarding their compensation while employed at Daugherty, most plaintiffs named multiple people at their specific business unit. *See, e.g.*, Doc. 98-34 at p. 8; Doc. 98-26 at p. 7; Doc. 98-25 at p. 6; Doc. 98-31 at pp. 4-5; Doc. 98-30 at p. 5; Doc. 98-37 at p. 4; Doc. 98-39 at p. 5; Doc. 98-40 at p. 5; Doc. 98-28 at p. 3; Doc. 98-24 at pp. 5-6. Only Fuqua named Ron Daugherty or Janet Daugherty, Doc. 98-49 at ¶ 11, only two named Wirth, Doc. 98-34 at p. 8; Doc. 98-25 at p. 6, and no plaintiffs named Garofalo. Four other plaintiffs did not name any individuals and stated that they had no knowledge regarding what role, if any, Ron Daugherty, Janet Daugherty, Wirth, or Garofalo played in compensation decisions. Doc. 98-35 at p. 3; Doc. 98-36 at p. 3;

13

Doc. 98-38 at p. 3; Doc. 98-29 at pp. 3–4.  O'Reilly admitted during her deposition that she had no firsthand knowledge regarding whether the Daughertys or Garofalo made or contributed to decisions about her or any other employee's compensation.  O'Reilly Vol. II Dep. at 123:20–125:8, Doc. 98-55.  While she did state that Wirth contributed to her compensation decisions, he served as branch manager of St. Louis at that time.  *Id*. at 125:7–25.  Thus, O'Reilly's testimony merely conforms with branch managers being involved with compensation decisions of employees in their branch.

### 3. Determination regarding whether a single, FLSA-violating policy exists or whether Plaintiffs held similar positions

#### i. Single, FLSA-violating policy

The evidence does not support the existence of a single, FLSA-violating policy because Daugherty did not impose a top-down compensation structure; rather, compensation decisions occurred at the branch level.  While Daugherty's corporate leadership approves the total salary adjustment for an entire branch, corporate leadership does not approve individual salary decisions.  Instead, supervisors provide compensation recommendations to the branch managers, who can then approve the recommendation without corporate approval.  Accordingly, employee compensation comes after a collaboration between local branch managers and the employee's supervisors, without input from corporate officials Ron Daugherty or John Wirth.

The present case has similarities to *White*.  301 F.R.D. at 374.  There, the plaintiffs—bartenders and servers—argued that they "were forced to participate in an illegal tip-sharing pool."  *Id*. at 374.  However, the evidence supported that the plaintiffs alleged a variety of different tipping policies, such as "tipping a percentage of the tips received, tipping a percentage of the food bill, or a flat pay out of $5–$10."  *Id*. at 373.  The Court granted the motion to decertify the class, finding that the policies were "too various and varied to form the basis of a

14

collective action. Rather, the purported unlawful tip sharing policy (if there is one) seems to

have affected the Plaintiffs in different and individual ways." *Id*. at 374.

Plaintiffs' alleged policy is similarly too varied to form the basis of a collective action.

Just as it's possible that every plaintiff in *White* suffered an FLSA violation based on sharing

tips, it's also possible that each plaintiff here was paid less than male comparators in violation of

the FLSA. But, as in *White*, certification of the class requires more similarity. Here, Plaintiffs'

compensation was determined by their supervisors in consultation with their branch managers,

and the composition of the compensation depended on their department code, role, and title,

which resulted in some plaintiffs receiving incentive bonuses while others could not. Thus, any

purported compensation policy affected plaintiffs differently depending on role, title, location,

etc. *See Arnold*, 2017 WL 1251033, at *7 ("Where a purported unlawful policy impacts

Plaintiffs in different and individual ways, 'there is not one single decision, policy, or plan but

rather multiple policies that require decertification.'" (citing *White*, 301 F.R.D. at 374)).

The lack of evidence supporting the existence of a "top-down" policy becomes even

more apparent when comparing the present case to those where the evidence supported finding a

"top-down" policy. For example, in *Nerland,* cited favorably by Plaintiffs, Doc. 104 at p. 14, the

plaintiff presented evidence that defendants "undertook examinations of the appropriateness of

its exemption classification for store managers[]" "on at least three separate occasions[.]" 564 F.

Supp. 2d at 1022–23. Further evidence suggested that during the defendant's review of the

exemption classification of store managers, the defendant did not examine the factual

circumstances of each stores manager's individual store setting in deciding whether that store

manager would be classified as exempt. *Id*. at 1023. Instead, defendants did not consider the

possibility of treating some store managers as exempt and others as non-exempt, instead treating all store managers as exempt. *Id*.

The court found that this evidence went "beyond a general showing that [the defendant] had a company policy of classifying all store managers under the executive exemption." *Id*. Instead, it "reveal[ed] that the mechanism behind Caribou's application of a uniform exemption classification is based upon Caribou's own generalized assumption that all store managers could be considered as similarly situated for the purposes of considering whether or not they should be classified as exempt." *Id*. The court therefore found that the defendant "ha[d] an internal company policy and practice of viewing its store managers as similarly situated for the purposes of making the FLSA exemption determination, and that this policy is applied uniformly to all Caribou store managers." *Id*. Simply stated, defendants adopted an "all or nothing" approach to the manager exemption, and the presence of this uniform policy "significantly lessen[ed] any concerns about variations in plaintiffs' employment circumstances." *Id*. But unlike the plaintiffs in *Nerland*, Plaintiffs have failed to present evidence establishing any "mechanism" behind Daugherty purportedly paying female employees less than male employees. In other words, while the plaintiffs in *Nerland* provided evidence tying a certain process applied by Caribou's corporate-level employees, including the Vice President of Human Resources, to the managers' exemption classification, Plaintiffs have not tied Daugherty's corporate-level employees to the individual salary determinations of its employees.

In *Bouaphakeo*, 765 F.3d at 796–97, the Eighth Circuit affirmed the district court's certification of an FLSA class based on a single, FLSA violating policy. The defendant argued that the "factual differences between [the] plaintiffs—differences in PPE and clothing between positions, the individual routines of employees, and variation in duties and management among

16

departments—make class certification improper." *Id*. at 797.  The Eighth Circuit rejected this

argument, emphasizing that the defendant "had a specific company policy—the payment of K-

code time for donning, doffing, and walking—that applied to all class members[,]" and "all class

members worked at the same plant and used similar equipment." *Id*.  Thus, despite the variance

in the plaintiffs' "donning and doffing routines, their complaint is not 'dominated by individual

issues' such that 'the varied circumstances . . .  prevent 'one stroke' determination.'" *Id*.

(quoting *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370 (8th Cir. 2013)).  But here, because

Plaintiffs have not presented evidence of a specific company policy that applied to all class

members, and Plaintiffs do not work at a single location or have the same roles, and instead have

different individuals making different compensation decisions, a "one-stroke" determination is

not feasible.

Finally, in *Rikard v. U.S. Auto Prot., LLC*, No. 4:11CV1580 JCH, 2013 WL 5532688, at

*3 (E.D. Mo. Oct. 4, 2013), although the plaintiffs had differing "hours, circumstances,

managers, and payment schemes[,]" the court found that those dissimilarities did not require it to

decertify the class.  Rather, the plaintiffs all claimed that the defendant failed to pay overtime

wages and relied on the "same alleged uniform course of conduct—managers encouraging and/or

requiring Plaintiffs to work after their shifts in order to meet established sales goals." *Id*.  The

plaintiffs also presented evidence such as declarations, sworn question responses, and deposition

testimony, "all tending to demonstrate Defendants' managers regularly instructed Plaintiffs to

work through their lunches, on Saturdays, and beyond their scheduled shifts, in order to meet

their quotas." *Id*.  The court found that this evidence gave "rise to an inference that Defendants

maintained a top-down, centralized policy regarding overtime." *Id*. (citation omitted).  But here,

while Plaintiffs presented evidence perhaps supporting that women were paid less than

comparable men, they offer nothing concrete supporting that managers were deploying a top-down or centralized policy to pay women less than men.

In sum, even assuming Daugherty did pay Plaintiffs less than comparable men in violation of the FLSA, Plaintiffs have failed to offer evidence connecting that end-result to a single, FLSA-violating policy that corporate-level employees Ron Daugherty, Janet Daugherty, Wirth, or Garofalo directed the branch managers to carry out. Accordingly, the Court finds that the evidence does not support that Daugherty had a single policy that men would be paid more than comparable women.

### ii.         Disparate employment settings

As stated above, the sole similarity Plaintiffs focus on is that they are all female employees of a company that they allege had a company-wide policy of paying women less than men. But the Court has found that the evidence does not support the existence of a company-wide policy. And the remaining evidence demonstrates that Plaintiffs had "disparate factual and employment settings." *Bouaphakeo*, 765 F.3d at 796. Plaintiffs worked across five different offices, were classified by different department codes, were further classified in different lines of service even within Department Code 110, held seven different titles, had seven different roles, and reported to 43 different supervisors. With respect to compensation, Plaintiffs identified an array of people at each of their individual branches they believed made their compensation decisions. Moreover, some Plaintiffs could receive incentive compensation, while others could not and did not.

Plaintiffs attempt to downplay the variety of titles and roles they held by arguing that all Daugherty employees are "expected to perform certain base level functions" and that Daugherty's job postings for a certain position are the same regardless of location. Doc. 104 at

pp. 8–10.  To support its argument that employees were expected to perform certain base level

functions and shared similar responsibilities and duties, Plaintiffs cite to a document titled

"Daugherty Titles and Roles" and employee declarations relying on that document.  Doc. 104-8;

Doc. 104-5 at ¶¶ 5–8.  While the document does include a list of duties and responsibilities

applicable to all Daugherty consultants, the duties and responsibilities are quite general and

apply to effectively any employee working in a client-service industry.  For example, all

consultants are expected to "[p]erform well under time/budget pressure[,]" "[c]ommunicate

proactively and effectively[,]" "[w]ork well with others[,]" "[e]stablish personal credibility and

client relationships within circle of influence[,]" and "[r]epresent Daugherty in a Professional

manner."  Doc. 104-8 at p. 3.  Moreover, after listing these general duties and responsibilities,

the remainder of the document breaks down the responsibilities of Daugherty employees by title,

*id.* at pp. 3–6, as well as the specific qualifications for each role.  *Id*. at pp. 7–41; *see also* Mirly

Dep. at 71:24–72:5, Doc. 104-4.

The job postings Plaintiffs rely upon also lend no support.  First, Plaintiffs pulled these

postings on March 4, 2021, the same day they filed their opposition to decertification, and all of

the postings were made in 2020 or later.  *See* Doc. 104-7.  Thus, these postings have minimal

bearing on the similarities between Daugherty employees during the relevant time period.

Second, the postings provide a general overview of what working at Daugherty could entail.  For

example, the postings state that the "ideal candidates" for Informational Architect, Information

Analyst, Data Engineer, or Big Data Developer is a "problem solver[] with the ability to utilize

insights, creativity, and perspective to drive business success."  *Id*. at p. 1.  The postings also ask

the candidate to "imagine" themselves performing tasks such as "assembling large, complex data

sets that meet functional/non-functional business requirements[,]" or "collaborating with clients

to design information management and business intelligence solutions." *Id*. Not only are these postings general, but a Daugherty employee's duties, even within the same role, come directly from the client they are assigned to. Mirly Dep. at 74:19–23, Doc. 104-4. Finally, even assuming the job posting served as evidence that the job duties of each role were the same across the different locations, the evidence does not account for the fact that compensation determinations are made at the local levels.

In sum, Plaintiffs have failed to establish that Daugherty had a single, FLSA-violating policy or that Plaintiffs' employment circumstances were otherwise sufficiently similar. Because the facts needed to establish Daugherty's liability are "too individualized," a collective action is not appropriate. *White*, 301 F.R.D. at 375. Accordingly, the Court finds that this factor weighs strongly in favor of decertification.

### 2.    Individualized or class-wide defenses

"The individualized defenses factor assesses whether potential defenses pertain to the plaintiff class or whether the potential defenses require proof of individualized facts at trial." *Arnold*, 2017 WL 1251033, at *8 (citations omitted). "Generally, '[d]efenses raised as to individual Plaintiffs, i.e., unclean hands, judicial estoppel, and [timeliness], further highlight the distinctions between the Plaintiffs' claims and, therefore, favor decertification.'" *Id*. (finding, among other defenses, that a statutory exemption was "not [a] common question[] that c[ould] be determined as a matter of law").

Plaintiffs' collective action is predicated on Daugherty's violating the Equal Pay Act. A plaintiff asserting an unequal pay claim under the EPA "must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions. If a plaintiff

establishes a prima facie case, the burden then shifts to the defendant to prove one of four statutory affirmative defenses." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (citing *Hutchins v. Int'l Bhd. of Teamsters,* 177 F.3d 1076, 1080–81 (8th Cir. 1999)). Under the EPA's statutory defenses, an employer is not liable for paying one sex more than another for equal work if the employer can provide that any wage differential is explained by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex[.]" 29 U.S.C. § 206(d)(1); *see also Price*, 664 F.3d at 1191.

Thus, in defending this action, Daugherty would have to provide evidence as to each plaintiff to establish that any disparity in compensation with a male comparator can be justified by one of the four statutory defenses under 29 U.S.C. § 206(d)(1).  For each plaintiff, a jury will have to hear evidence from each supervisor responsible for her compensation, understand how a particular plaintiff's title, role, experience, etc. affected her compensation, and then be presented with evidence showing that she was paid less than a male comparator.  Moreover, keeping track of each plaintiff's circumstances in assessing the validity of these defenses will prove difficult because Plaintiffs identified 43 different supervisors and managers.  Doc. 98-25 at p. 5; Doc. 98-26 at p. 7; Doc. 98-27 at p. 3; Doc. 98-28 at p. 3; Doc. 98-30 at p. 5; Doc. 98-31 at p. 4; Doc. 98-32 at p. 5; Doc. 98-33 at p. 4; Doc. 98-34 at p. 7; Doc. 98-35 at p. 3; Doc. 98-36 at p. 3; Doc. 98-37 at p. 3; Doc. 98-38 at p. 3; Doc. 98-39 at p. 4; Doc. 98-40 at 5; Doc. 98-41 at p. 3; Doc. 98-42 at p. 4; O'Reilly Dep. at p. 20:8-13, Doc. 98-5.  Plaintiffs also identified approximately 83 different male comparators, only 14 of whom are identified by more than one plaintiff.  Doc. 98-25 at pp. 2–4; Doc. 98-26 at pp. 2, 4–5; Doc. 98-27 at pp. 1–2; Doc. 98-30 at pp. 2–3; Doc. 98-31 at pp. 2–3; Doc. 98-32 at pp. 3–4; Doc. 98-33 at pp. 2–3; Doc. 98-34 at pp. 4–5; Doc. 98-36 at p.

1; Doc. 98-37 at pp. 1–2; Doc. 98-39 at p. 2; Doc. 98-40 at pp. 2–3; Doc. 98-41 at pp. 1–2; Doc. 98-42 at p. 2; Doc. 98-49 at p. 2; Doc. 98-44 at p. 2.  Thus, the fact that Daugherty can assert a defense under 29 U.S.C. § 206(d)(1) against each plaintiff and establishing each defense will involve a different cast of characters "further highlight[s] the distinctions between the Plaintiffs claims and, therefore, favor decertification.'"  *Arnold*, 2017 WL 1251033, at *8 (citations omitted).

Daugherty also asserts a separate and distinct defense as to Pam Doty, claiming that she waived any claims under the Equal Pay Act when she executed a resignation and release agreement before opting into this case.  Doc. 98 at p. 30.  Plaintiffs do not address this argument in opposition, and thus the Court finds Daugherty has set forth an additional potential individual defense.

Accordingly, because these individual defenses cannot be shown by common proof, but rather by an evaluation of facts unique to each specific plaintiff, *Arnold*, 2017 WL 1251033, at *8, the Court finds that this factor weighs in favor of decertification.

### 3.     Fairness and procedural considerations

"[T]he fairness and procedural factors direct the court to consider whether it can analyze the opt-in class with a 'broad scale approach.'"  *White*, 301 F.R.D. at 377 (citing *Moss v. Crawford & Co.,* 201 F.R.D. 398, 410 (W.D. Pa. 2000)).  "The purpose of a collective action is to try several claims, rather than multiple individual trials.  However, for a collective action to be efficient, there must be 'the same factual and legal issues.'" *Id*. at 378 (quoting *Johnson v. Big Lots Stores, Inc.,* 561 F. Supp. 2d 567, 587 (E.D. La. 2008)).  Decertification is warranted when defending against the collective claims would require the defendant "to pick the class apart, plaintiff by plaintiff[.]"  *Espenscheid v. DirectSat USA, LLC*, 2011 WL 2009967, *7 (W.D. Wis.

May 23, 2011) (citing *Johnson*, 561 F. Supp. 2d at 586).  Such an "exercise is tantamount to conducting multiple individual trials on the merits and is the antithesis of a collective action." *Id*. (quoting *Johnson*, 561 F. Supp. 2d at 586).

The evidence supports that determining whether Daugherty violated the FLSA by paying male employees more than similarly-situated female employees would result in 20 mini-trials. As stated above, Daugherty's defense would include providing evidence as to each plaintiff to establish that any disparity in compensation with a male comparator can be justified by one of the four statutory defenses under 29 U.S.C. § 206(d)(1).  Given all the differences between the plaintiffs and how they are compensated, it will be difficult for a jury to keep track of and differentiate between each plaintiff's claims. *Bertroche v. Mercy Physician Assocs., Inc.*, No. 18-CV-59-CJW-KEM, 2019 WL 4307127, at *28 (N.D. Iowa Sept. 11, 2019).  Additionally, despite all the evidence a jury would have to consider, Plaintiffs make no attempt to demonstrate how this case could be efficiently tried.  Plaintiffs opposing a motion for decertification sometimes propose a detailed trial plan to show that the case can be manageably tried as a collective action, often suggesting that a named-plaintiff's testimony will be representative of the experiences of the entire class or that a damages expert will explain how damages will be calculated. *See Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040, 1050 (E.D. Mo. 2017); *see also Arnold*, WL 1251033, at *9; *White*, 301 F.R.D. at 376.  In contrast, Plaintiffs offer no trial plan, nor do they suggest any named plaintiff that could present representative testimony.  Plaintiffs simply make no attempt to allay any concerns that this case cannot be efficiently managed as a collective action due to the individualized nature of each plaintiff's claim.

Accordingly, based on the evidence presented, the Court finds that the conditional class simply lacks the requisite factual similarities needed to proceed on a class-wide basis. *White*, 301 F.R.D. at 378. Although some evidence may overlap between Plaintiffs, the determination of Daugherty's liability ultimately necessitates drilling down to the specific circumstances of each individual plaintiff. Proceeding on a class-wide basis under these circumstances would require the jury to hear evidence regarding the specific claims of 20 plaintiffs, make findings regarding each plaintiff, and then weigh the findings as to each plaintiff to reach its final decision regarding Daugherty's liability. Simply put, the individualized nature of each plaintiff's claim would require 20 mini-trials, thus defeating the underlying purposes of collective actions. *Id*; *see also Arnold*, 2017 WL 1251033, at *9.

## IV. Conclusion

Accordingly, the Court grants [97] Daugherty's Motion to Decertify Conditional Class, and dismisses the Opt-In Plaintiffs, without prejudice.

So Ordered this 30th day of September 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

24